*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

*In re* BEVENSEE/LOUZON/MANUEL, Minors.

UNPUBLISHED
April 9, 2020

No. 349846
Wayne Circuit Court
Family Division
LC No. 17-001999-NA

Before: M. J. KELLY, P.J., and FORT HOOD and BORRELLO, JJ.

PER CURIAM.

Respondent-mother appeals as of right the trial court's order terminating her parental rights to her four minor children—QAB, LTL, TJL, and LAM—under MCL 712A.19b(3)(c)(*i*) (conditions of adjudication continue to exist), (g) (failure to provide proper care and custody), and (j) (reasonable likelihood of harm if returned to parent).[1] The issues raised by mother on appeal relate only the trial court's adjudication decision. For the reasons set forth in this opinion, we affirm.

## I. BACKGROUND

On November 2, 2017, a petition was filed regarding mother's four children, QAB, LTL, TJL, and LAM. The petition alleged that mother lived with her boyfriend, James Seloom, and that mother and Seloom engaged in domestic violence in front of mother's children. This included, most recently, an incident on October 25, 2017, during which LAM was present. Seloom had also threatened to kill mother and her children at some point. All four children lived in the home with mother. Mother had indicated that LAM's father, Michael Manuel also lived in the home, but Manuel had also reported being homeless. Mother, Seloom, and Manuel[2] were being evicted from

---

[1] This order also terminated the parental rights of QAB's father (Steven Gorny) and LAM's father (Michael Manuel), but neither of these fathers is a party to this appeal.

[2] There are places in the record where mother is indicated as having the last name "Manuel" too. She was married to Manuel at the time of the adjudication trial. In this opinion, we will use "Manuel" only to refer to Michael Manuel and we will refer to mother only as "mother."

this home. Additionally, mother had tested positive for cocaine and had a history of leaving her children unattended and without proper supervision.

The petition further alleged that QAB's father, Steven Gorny, had not provided any financial support for QAB and had not engaged with the Department of Health and Human Services (DHHS) during its investigation. Mother, Gorny, Manuel, and Seloom were all named as respondents in the petition.[3] The petition indicated that LTL and TJL were placed with their father, Timothy Louzon, and that the DHHS was not seeking to remove LTL and TJL from Louzon's care. Louzon was not named as a respondent in the petition. The petition was authorized.

The matter proceeded to a bench trial regarding adjudication that began on January 12, 2018. Certified medical records were introduced as an exhibit at trial showing that mother had tested positive for cocaine metabolite on January 10 and June 14, 2017. Petitioner proceeded with calling its witnesses. CPS Child Protective Services (CPS) worker Esther Harris testified that she had received a referral on July 30, 2017, regarding domestic violence between mother and Seloom. Harris investigated, and she spoke with mother, Seloom, the children, and doctors. Mother told Harris that she had slipped on a skateboard and sprained her wrist. Certified medical records from mother's hospital visit on July 30, 2017, were admitted as an exhibit at trial, and these records showed that mother went to the hospital for a wrist injury that was diagnosed as a sprain. These medical records further indicated that mother first reported tripping over toys but later admitted to medical personnel that she had been the victim of physical abuse by her fiancé. Harris testified that she never observed the children to have been physically harmed.

Mother had been diagnosed with bipolar disorder, and she reported being on "multiple medications" for bipolar and other medical conditions. Harris testified that she was concerned about substance abuse with mother because of the "long list of medications that [mother] told me she had." Harris further explained that she met with mother "on multiple occasions" and that mother's "affects and her demeanor would change, depending on the day." According to Harris, "[s]ometimes [mother] seems sluggish, sometimes she seemed over-excited. Other days, she was just kind of blah, to say the least."

Following the July 30, 2017 domestic violence incident, Family Together for Better Solutions (FTBS) was put into place for the family with LaShonte Lee as the assigned worker. However, according to Harris, complaints for domestic violence and improper supervision were still received while Lee was working with the family.

FTBS worker Lee testified that she worked with mother in mother's home for approximately 30 days in September 2017, on issues related to domestic violence, medication abuse, and other substance abuse with the family. Lee testified that she made a complaint to CPS on her first day working with the family because the children were home alone when she arrived. QAB, the oldest child, was 11 years old at the time. According to Lee, the children answered the

---

[3] Seloom was a non-parent adult respondent. Gorney, Manuel, and Seloom are not parties to this appeal and will only be discussed as necessary to provide context for the factual circumstances and appellate issues relevant to mother.

-2-

door and told Lee that mother had given them permission to go the park. Lee was concerned about the safety of LAM, who was only three years old, because LAM "was on the back of a bike." Lee tried to call mother but received no answer. At that point, Lee called CPS. Lee was able to contact Seloom at some point, and he came and picked up the children. Lee later learned that mother had been taken to a medical appointment. Lee was involved with the family for approximately three to four more weeks, and she was aware of "other domestic violence in the home where Mr. Seloom and [mother], the police have been called." According to Lee, she saw bruises on mother's arm, knee, and face in September 2017, and mother had told Lee that Seloom caused the facial bruising. Mother showed Lee a drug test result from her doctor indicating that mother was positive for the presence of cocaine, but mother told Lee that she had not used cocaine. Mother admitted to Lee that Seloom used cocaine and that there was cocaine in the home.

Officer Stefan Bero, of the Redford Township Police Department, testified that he responded to a call on October 25, 2017, regarding an alleged domestic violence incident. When he arrived, mother told him that Seloom "smashed items in the home, physically assaulted her in front of her young child[,] and . . . left the location." Bero testified that mother reported being pushed down to the ground by Seloom and being held down as Seloom "appl[ied] his forearms to her throat," making it difficult for her to breath. Bero indicated that he noticed that the furniture had been "shoved" and "tossed" around the living room, that there were broken dishes on the kitchen floor, and that there was a large steak knife on the living room couch. He saw a young girl in the living room with mother's friend. Seloom was arrested shortly afterward. In the patrol car, Bero heard Seloom threaten to kill mother and "everyone in" the home.

Mother's sister, Sabrina Farnsworth, testified that LAM was currently placed in her care. Farnsworth first became concerned about the children's care approximately four years earlier when Manuel "hung himself in front of the children" while mother was at work and Manuel was babysitting the children. The police and CPS were called. The children saw Manuel being taken out of the home on a stretcher by medical personnel. Farnsworth learned about the incident from mother. Additionally, Farnsworth testified that approximately a year and a half before the adjudication trial, mother was involved in a new relationship because her relationship with Manuel was "over," and Manuel "came back over and tried to kill [mother's] current boyfriend in front of the children" by "strangl[ing] him with an extension cord." A certified order of probation for Manuel was subsequently admitted as an exhibit at trial, and the order reflected that Manuel pleaded guilty in 2016 to assault by strangulation and assault with intent to do great bodily harm.

Following Farnsworth's direct testimony, the adjudication trial was continued to January 23, 2018, due to time constraints and the court's schedule. The proceeding continued on January 23. At the beginning of the proceeding, the referee stated, "We did have a side bar before going on the record. It's my understanding that the parties do not wish to continue with trial and that—ahh-both mother and Mr. Manuel are stipulating to jurisdiction. Is that correct?" Mother's attorney affirmatively confirmed that this was true by stating, "That's correct Your Honor." The following exchange occurred:

> *The Court*: And the parties have agreed—umm—that the court would consider all the evidence already admitted?

[*Assistant Attorney General*]: Umm—Yes Your Honor. Mother and father stipulate that they seen [sic] all the evidence admitted. They stipulate to jurisdiction, screens and their treatment plan.

The referee then addressed mother and Manuel as follows:[4]

*The Court*: Mother and Mr. Manuel, I don't believe we need to do a full advice of rights but I just want you to know that the trial has begun. Umm—we're at the point where—umm—the child's attorney . . . is still putting on his case.[5] You would have the opportunity if we continue with trial, to go ahead and present your own evidence. Ahh—but based on what your lawyers are telling me, you're ready to stop the trial right now. You want to agree that there is grounds for jurisdiction based on what DHHS has already presented to the court and you've already agreed to the service plan that's going to be presented to the court.

[*Mother's Attorney*]: Yes Your Honor.

*The Court*: Is that correct Mr. Manuel?

*Mr. Manuel*: Yes Your Honor.

[*Mother's Attorney*]: I need mom-(inaudible).

*The Court*: Mom?

[*Mother*]: (Inaudible).

*The Court*: Yes. Okay. She's indicating yes. All right. I take it then there's no need for any closing statements. All parties are in agreement.

* * *

Based on the evidence already presented—umm—previously, now there's six DHHS exhibits testimony of three and a half witnesses. The court is considering all that and there is a basis for this court based on that to exercise jurisdiction over all the children.

The referee then proceeded to disposition, and mother was ordered to complete and demonstrate benefit from various services. Over the course of the following year, mother essentially ceased participating in these services to any meaningful extent and infrequently visited

---

[4] It does not appear that Gorny had participated at all in the case by this point. The referee had previously noted at the hearing on January 3, 2018, that Gorny had not responded to any attempts to serve him and that service by publication had been authorized and completed for him.

[5] The assistant attorney general, representing the DHHS, had already rested. Farnsworth was the first and only witness called by the children's lawyer-guardian ad litem.

the children. She also failed to adequately communicate regarding her claimed participation in other services, and her whereabouts were unknown for a period of time. A supplemental petition seeking termination of her parental rights was filed. By the time of the termination hearing in April 2019, mother had not visited the older three children since May 2018. Her parental rights to all four children were terminated as previously noted. Mother does not challenge the trial court's termination ruling on appeal, instead raising only claims of error with respect to the manner in which her adjudication was completed and her counsel's performance related to the adjudication proceeding.

## II. ADJUDICATION

On appeal, mother first argues that her adjudication was deficient and violated her constitutional due process rights such that the termination proceedings were void *ab initio*. She maintains that by "stipulating to jurisdiction," she "was in actuality admitting the material allegations of the petition," which "had the same effect as if she had tendered a plea to the petition." Mother argues that the referee was thus obligated to comply with MCR 3.971 in accepting mother's "plea."

### A. ISSUE PRESERVATION AND STANDARD OF REVIEW

Mother did not challenge her adjudication, or the procedure by which it was obtained, in the trial court. Therefore, mother's appellate arguments related to this issue are unpreserved. *In re TK*, 306 Mich App 698, 703; 859 NW2d 208 (2014).

This Court reviews de novo, as a question of constitutional law, whether child protective proceedings complied with a parent's due process rights. *In re Ferranti*, 504 Mich 1, 14; 934 NW2d 610 (2019). However, in this case, mother did not raise her claim of adjudication error until after her parental rights had already been terminated. This unpreserved issue is reviewed for plain error. *Id.* at 29 ("[A]djudication errors raised after the trial court has terminated parental rights are reviewed for plain error.").[6] Under the plain-error standard, mother "must establish that (1) error occurred; (2) the error was 'plain,' i.e., clear or obvious; and (3) the plain error affected [her] substantial rights. And the error must have 'seriously affect[ed] the fairness, integrity or public reputation of judicial proceedings[ ] . . . .' " (citations omitted; second and third alterations in original; ellipsis in original)." *Id.*

### B. ANALYSIS

Child protective proceedings in Michigan are comprised of the adjudicative phase and the dispositional phase. *In re Sanders*, 495 Mich 394, 404; 852 NW2d 524 (2014). "The question at adjudication is whether the trial court can exercise jurisdiction over the child (and the respondents-

---

[6] In *Ferranti*, 504 Mich at 35, our Supreme Court held "that an appeal of an adjudication error in an appeal from an order terminating parental rights is not a collateral attack" and that "[t]he collateral-bar rule does not apply within one child protective case, barring some issues from review." In doing so, our Supreme Court overruled *In re Hatcher*, 443 Mich 426; 505 NW2d 834 (1993). *Ferranti*, 504 Mich at 8.

parents) under MCL 712A.2(b) so that it can enter dispositional orders, including an order terminating parental rights." *Ferranti*, 504 Mich at 15. Our Supreme Court explained in *Ferranti*:

> The court can exercise jurisdiction if a respondent-parent enters a plea of admission or no contest to allegations in the petition, see MCR 3.971, or if the Department proves the allegations at a trial, see MCR 3.972. "If a trial is held, the respondent is entitled to a jury, the rules of evidence generally apply, and the petitioner has the burden of proving by a preponderance of the evidence one or more of the statutory grounds for jurisdiction alleged in the petition." *Sanders*, 495 Mich at 405 (citations omitted). And "[w]hile the adjudicative phase is only the first step in child protective proceedings, it is of critical importance because the procedures used in adjudicative hearings protect the parents from the risk of erroneous deprivation of their parental rights." *Id*. at 405-406 (quotation marks, citation, and brackets omitted). The adjudication divests the parent of her constitutional right to parent her child and gives the state that authority instead. [*Ferranti*, 504 Mich at 15-16 (alteration in original).]

"Due process requires . . . either a plea hearing that comports with due process and the court rule or, if respondents choose, a trial." *Id*. at 31, citing MCR 3.971[7] and MCR 3.972.[8]

In this case, mother argues on appeal that her "stipulat[ion] to jurisdiction" constituted a plea that required compliance with MCR 3.971(C)(1) and (2),[9] which provide as follows:

> (1) Voluntary Plea. The court shall not accept a plea of admission or of no contest without satisfying itself that the plea is knowingly, understandingly, and voluntarily made.

> (2) Accurate Plea. The court shall not accept a plea of admission or of no contest without establishing support for a finding that one or more of the statutory grounds alleged in the petition are true, preferably by questioning the respondent unless the offer is to plead no contest. If the plea is no contest, the court shall not question the respondent, but, by some other means, shall obtain support for a finding that one or more of the statutory grounds alleged in the petition are true. The court shall state why a plea of no contest is appropriate.

The *Ferranti* Court explained that ensuring that a plea is knowingly, understandingly, and voluntarily made also implicates MCR 3.971(B), which generally requires the trial court to advise a respondent before accepting a plea of the rights being waived and the consequences of the plea.

---

[7] MCR 3.971 concerns pleas in child protective proceedings. See also *Sanders*, 495 Mich at 405.

[8] MCR 3.972 concerns adjudication trials in child protective proceedings. See also *Sanders*, 495 Mich at 405.

[9] This court rule has recently been amended; the quoted language above, although unchanged, now appears in MCR 3.971(D). See 504 Mich ___; *Ferranti*, 504 Mich at 9 n 1.

See *Ferranti*, 504 Mich at 21; see also MCR 3.971(B).[10] In *Ferranti*, 504 Mich at 9, 30-31, our Supreme Court concluded that the trial court had committed plain error requiring reversal, and vacated the trial court's adjudication order, where the trial court had accepted the respondents' pleas without advising them of the rights they were waiving or the consequences of entering their pleas. The *Ferranti* Court held that "[t]he trial court violated the respondents' due-process rights when it accepted the respondents' pleas without advising them of their rights or ensuring that the respondents' pleas were knowingly, understandingly, and voluntarily made." *Id*. at 36.

In this case, contrary to mother's assertion on appeal, MCR 3.971 was not implicated because mother's adjudication was not based on a "plea" of admission or no contest. See MCR 3.971(A) (permitting a respondent to "make a plea of admission or of no contest to the original allegations in the petition"). Mother ignores the fact that here, unlike the factual circumstances that were present in *Ferranti*, mother actually had an adjudication trial during which the DHHS presented its entire case and rested, and the lawyer-guardian ad litem (LGAL) for the children called one witness and presented the witness's direct testimony. It was only after this point that mother decided to "stipulate[e] to jurisdiction." Thus, at most, mother only gave up her opportunity to further challenge the case against her fitness as a parent,[11] either through cross-examination or the presentation of her own witnesses. The referee informed mother that she had the right to present her own evidence if the trial were to continue, and the record indicates that mother affirmatively responded that she was agreeing to forego that opportunity.[12] Accordingly, mother waived her right to present her own evidence to rebut that of the DHHS and the children's LGAL. *Ferranti*, 504 Mich at 33 ("Waiver is the intentional relinquishment or abandonment of a known right . . . .") (quotation marks and citation omitted).

The referee then stated that the finding of jurisdiction was based on all of the evidence that had already been presented at the trial. The adjudication order also states that the determination that statutory grounds for jurisdiction existed was based on a preponderance of the evidence at trial. The adjudication order does not indicate that jurisdiction was based on a plea of admission or a plea of no contests. Furthermore, mother did not personally admit at the hearing to the facts alleged in the petition. While the choice of the phrase "stipulating to jurisdiction" was perhaps a poor choice of words, the effect of mother's decision was actually no different than if mother had

---

[10] Because we conclude that mother did not actually enter a plea, and that MCR 3.971 was thus not implicated, there is no need to discuss the specific rights outlined in MCR 3.971(B) or the effect of the amendments to the court rule that have been adopted since mother's adjudication.

[11] See *Sanders*, 495 Mich at 405 ("When the petition contains allegations of abuse or neglect against a parent, MCL 712A.2(b)(1), and those allegations are proved by a plea or at the trial, the adjudicated parent is unfit.")

[12] Although the transcript indicates that mother's response to the referee's question was "inaudible," the transcript also includes the referee's statement that immediately followed, in which the referee indicated that mother had responded "yes." Thus, it is clear from the transcript that mother gave an affirmative response to the question whether she was agreeing to the adjudication procedure.

simply declined to cross-examine the LGAL's witness and declined to call any witnesses of her own. The record reflects that mother's adjudication was based on the evidence introduced at her trial rather than on any admission or "plea" by her, and her due process rights were thus protected. *Ferranti*, 504 Mich at 31.[13] Because mother's adjudication was not based on a plea of admission or no contest, MCR 3.971 was not implicated and the referee did not commit plain error by not applying this court rule under the factual circumstances of this case.

Next, mother additionally argues that her adjudication was improper because the referee failed to make factual findings and the evidence did not support the establishment of jurisdiction.

At an adjudication trial, the burden is on the petitioner to prove by a preponderance of the evidence that one or more of the alleged statutory grounds for jurisdiction under MCL 712A.2(b) exist. *Ferranti*, 504 Mich at 15. In this case, the petition alleged that the court had jurisdiction under MCL 712A.2(b)(1) and (2), which provide in relevant part as follows:[14]

> The court has the following authority and jurisdiction:
>
> * * *
>
> (b) Jurisdiction in proceedings concerning a juvenile under 18 years of age found within the county:
>
> (1) Whose parent or other person legally responsible for the care and maintenance of the juvenile, when able to do so, neglects or refuses to provide proper or necessary support, education, medical, surgical, or other care necessary for his or her health or morals, who is subject to a substantial risk of harm to his or her mental well-being, who is abandoned by his or her parents, guardian, or other custodian, or who is without proper custody or guardianship . . . .
>
> * * *

---

[13] We reiterate that mother did not give up her right to a trial or an adjudication; she *had* a trial. Mother is simply incorrect in stating on appeal that she was not given an adjudication.

[14] This statute has been amended since mother's adjudication. However, the added language involves the definition of the term "neglect," which is not implicated in our analysis with respect to mother under the facts of this case where the circumstances that caused a risk of harm to the children or cause the home environment to be unfit were related to domestic violence, substance abuse, and leaving the children unattended. The amended version of the statute provides that "neglect" is defined by MCL 722.602. MCL 712A.2(b)(1)(B) and (b)(2), as amended by 2018 PA 58. Under MCL 722.602(d), "neglect" means "harm to a child's health or welfare by a person responsible for the child's health or welfare that occurs through negligent treatment, including the failure to provide adequate food, clothing, shelter, or medical care, though financially able to do so, or the failure to seek financial or other reasonable means to provide adequate food, clothing, shelter, or medical care." Such facts are not pertinent to our resolution of the appellate arguments related to the adjudication of mother.

(2) Whose home or environment, by reason of neglect, cruelty, drunkenness, criminality, or depravity on the part of a parent, guardian, nonparent adult, or other custodian, is an unfit place for the juvenile to live in . . . .

In this case, the referee stated on the record that she found that a basis for the court's jurisdiction had been established by the evidence admitted at trial. Additionally, the adjudication order specifically provides that the court found that the evidence admitted at trial proved that mother and Saloom "engaged in extensive domestic violence in the presence of the children," that mother and Saloom "have tested positive for cocaine," that mother abused her prescription medications, that Manuel was convicted of an assault by strangulation and assault with intent to do great bodily harm in 2016, and that Manuel had attempted "to hang himself in the presence of the children." The adjudication order indicates that the court found that a preponderance of the evidence established that there were statutory grounds to exercise jurisdiction based on failure to provide support, substantial risk of harm to mental well-being, abandonment, and an unfit home environment.

With respect to mother, the evidence at trial supported the trial court's findings that, at a minimum, jurisdiction was established under MCL 712A.2(b)(2) because the children's "home or environment, by reason of neglect, cruelty, drunkenness, criminality, or depravity on the part of a parent, guardian, nonparent adult, or other custodian, [was] an unfit place for the juvenile to live in." There was evidence of a pattern of domestic violence in the home from which mother failed to extricate her children. There was evidence that mother had reported that Seloom assaulted her in front of LAM. "Evidence of violence between parents in front of the children is certainly relevant to showing, as provided under subsection (2) of the statute, that the home is an unfit place for the children by reason of criminality or depravity." *In re Miller*, 182 Mich App 70, 80; 451 NW2d 576 (1990). There was also evidence that mother and Seloom were using cocaine and that cocaine was present in the home. The trial court did not plainly err by determining that there was a statutory basis for its jurisdiction with respect to mother. *Ferranti*, 504 Mich at 15, 29; see also *Sanders*, 495 Mich at 422 (holding that due process requires that each parent receive a specific adjudication of his or her unfitness).

### III. INEFFECTIVE ASSISTANCE OF COUNSEL

Mother next argues that she received ineffective assistance of counsel based on her attorney's failure to object to the referee's decision that it was unnecessary to follow MCR 3.971(C) and give mother a full advice of rights with respect to the stipulation to jurisdiction at the adjudication hearing. Mother further argues that her attorney's attempt to make a record of mother's agreement to the procedure was insufficient because mother's responses appear as "inaudible" in the transcript.

### A. ISSUE PRESERVATION AND STANDARD OF REVIEW

"The principles applicable to claims of ineffective assistance of counsel in the arena of criminal law also apply by analogy in child protective proceedings . . . ." *In re Martin*, 316 Mich App 73, 85; 896 NW2d 452 (2016). Mother did not raise a claim of ineffective assistance of counsel in the trial court by moving for a new trial or evidentiary hearing. Therefore, this issue is therefore unpreserved and this Court's review is limited to considering whether the appellate

record supports mother's claim. *People v Sabin (On Second Remand)*, 242 Mich App 656, 658-659; 620 NW2d 19 (2000). "Whether a person has been denied effective assistance of counsel is a mixed question of fact and constitutional law. Findings on questions of fact are reviewed for clear error, while rulings on questions of constitutional law are reviewed de novo." *People v Jordan*, 275 Mich App 659, 667; 739 NW2d 706 (2007) (quotation marks and citation omitted).

## B. ANALYSIS

A claim of ineffective assistance of counsel requires a respondent to show "that (1) counsel's performance was deficient, falling below an objective standard of reasonableness, and that (2) the deficient performance prejudiced the respondent." *Martin*, 316 Mich App at 85. Demonstrating prejudice requires a showing that "it is reasonably probable that, but for counsel's ineffective assistance, the result of the proceeding would have been different." *Jordan,* 275 Mich App at 667.

In this case, as previously explained, there was no need to apply MCR 3.971 because mother was not entering a plea of admission or no contest, and counsel therefore did not perform deficiently by not requesting that the referee comply with that court rule. "Counsel is not ineffective for failing to make a futile objection." *Martin*, 316 Mich App at 86 (quotation marks and citation omitted). Additionally, the record indicates that mother's counsel made a record of her agreement to the manner in which the adjudication was concluded and that the referee noted mother's actual agreement. That mother's statement was inaudible to the transcriptionist was apparently not brought to counsel's attention. Clearly, the referee understood mother's response. Accordingly, this is not something that reflects on counsel's performance. Furthermore, contrary to mother's assertions on appeal, the trial court made specific findings of fact supporting its finding of jurisdiction, and mother's adjudication was not based on a plea of admission or no contest. Mother therefore has not offered any coherent explanation of how she was prejudiced by counsel's actions even if they had been the result of deficient performance. Mother has not shown that she received ineffective assistance of counsel. *Martin*, 316 Mich App at 85. Affirmed.

/s/ Michael J. Kelly
/s/ Karen M. Fort Hood
/s/ Stephen L. Borrello

-10-